UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RANDY K. SILVA,                      )
                                     )
            Petitioner,              )
      v.                             )        CIVIL ACTION
                                     )        NO. 11-10944-JGD
SUPERINTENDENT GARY RODEN,           )
                                     )
            Respondent.              )

## MEMORANDUM OF DECISION AND ORDER ON PETITION
## FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

September 29, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

On February 13, 2002, following a six-day jury trial in Bristol County Superior Court, the Petitioner, Randy K. Silva ("Silva" or "Petitioner"), was convicted of the deliberately premeditated murder of James Schiano, armed assault of David DeAndrade with intent to kill, and assault and battery of DeAndrade by means of a dangerous weapon.  See Commonwealth v. Silva, 455 Mass. 503, 505, 918 N.E.2d 65, 72 (2009). His motion for a new trial was denied, and his convictions were affirmed by the Massachusetts Supreme Judicial Court ("SJC") in a decision dated December 21, 2009. Id. at 505, 918 N.E.2d at 73.  A subsequent motion for a new trial was denied as well. This matter is before the court on Silva's timely petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Respondent opposes the petition on various grounds.

The Petitioner, who is represented by court-appointed counsel, has withdrawn Ground 4, as unexhausted. He otherwise continues to pursue his remaining ten grounds for relief.

After careful consideration of the record, and for the reasons detailed herein, Silva's habeas petition is DENIED.

## II. STATEMENT OF FACTS[1]

### The Underlying Crime

Silva was indicted on April 27, 2001 by a Bristol County grand jury on charges of murder of James Schiano, armed assault with intent to murder David DeAndrade, and assault and battery of DeAndrade with a dangerous weapon. (RA Ex. A at 4, 11). He was convicted of all charges by a jury following a six-day trial. (RA Ex. A at 4, 6). He was sentenced to life imprisonment for the murder conviction, with concurrent eight to ten year sentences for the other convictions. (RA Ex. A at 6). His conviction, and the denial of his first motion for a new trial, were affirmed by the SJC on December 21, 2009. See Silva, 455 Mass. at 505, 918 N.E.2d at 73. The SJC declined to exercise its discretionary authority under Mass. Gen. Laws ch. 278, § 33E. Id.

As described by the SJC, the facts which the jury could have found are as follows:

---

[1] The Respondent filed the "Respondent's Appendix" ("RA") containing the record below as Docket No. 13 in connection with his Motion to Dismiss. He filed supplemental pleadings as exhibits to his "Memorandum in Opposition to Petition" (Docket No. 59) ("Supp. RA"). In addition, other pleadings below were attached to his "Answer to Petition" (Docket No. 58) ("Resp. Ans."), filed after the denial of his motion to dismiss.

In or around March, 2001, Silva's friend, Jeffrey Padon, and Padon's girlfriend, Julie Soloway, purchased cocaine from DeAndrade, for which they owed him fifteen dollars. Silva, 455 Mass. at 505, 918 N.E.2d at 73. After telephoning them several times for his money, on April 7, 2001, DeAndrade went to their apartment to demand payment. Id. DeAndrade left a message with Soloway's roommate, Shrayna Ambers, stating that if he did not get his money "something's going to happen." Id. Upon receipt of this message, Padon telephoned DeAndrade to inform him that he had the money. Id. However, at this point, DeAndrade was no longer interested in simply obtaining his money, but wanted a fight, and told Padon that he would stop by "with my boys." Id.

Padon was concerned that he would be outnumbered, and called Silva for assistance in the event that trouble ensued. Id. at 506, 918 N.E.2d at 73. Shortly after this request for help, Silva arrived at Padon's apartment accompanied by two other men. Id. After Padon told Silva what DeAndrade said, Silva reassured him that nothing would happen, and then left with the two men. Id. He returned to the apartment alone two to three hours later. Id. Then, around ten minutes after Silva's return, DeAndrade arrived at Padon's apartment. Id. He had met Schiano and three women, all of whom he was driving to a party. Id.

Padon, Soloway, Ambers, and Silva went outside to meet DeAndrade. Id. Soloway offered DeAndrade the fifteen dollars that he was owed, but he refused to accept it, and pushed her away. Id. DeAndrade repeatedly lifted his shirt and challenged Padon to a fight. Id. Silva approached DeAndrade and said "Don't do it, partner. It's not worth

it." Id.  However, the situation continued to escalate, and the parties started to shout at each other.  Id.  Then, Silva said, "Oh, tough guy, huh?  I got something for you," and walked away.  Id.  Fearful that Silva might have hidden a gun somewhere, DeAndrade followed him.  Id. at 506, 918 N.E.2d at 73-74.  Silva then started running, and DeAndrade kept pace.  Id.  Upon passing DeAndrade's car, Schiano and one of the three women exited the car and followed them.  Id. at 506, 918 N.E.2d at 74.

Right before DeAndrade caught up to Silva, Silva turned around and pointed a gun at DeAndrade.  Id.  Somone shouted "I'll show you," and Silva shot DeAndrade five times.  Id.  Schiano went to attend to DeAndrade, who had fallen to the ground.  Id.  As Schiano was standing up, Silva ran toward him and shot him six times, killing him.  Id.  DeAndrade survived his wounds.

Upon hearing the gunshots, Padon, Soloway, and Ambers ran back to their apartment, where they were promptly joined by Silva.  Id. at 507, 918 N.E.2d at 74.  He had a gun with a red light on it which was similar to a laser.  Id.  At some point, Silva left, but during the course of the evening Silva and Padon spoke several times.  Id.  Silva asked Padon to gather the shell casings because they might be traced to his gun.  Id.  He also told Padon that the witnesses "had to come up with the same story to cover up what happened."  Id.  Silva first suggested that they say that DeAndrade never appeared, and he later told the witnesses to say that DeAndrade had been "beating on him" so he had shot DeAndrade in self defense.  Id.

Silva was arrested the following morning.  Id.  He told the police that he did not

mean to shoot anyone, but that the victims had knives.  Id.  However, neither of the

victims had weapons on them.  Id.  Upon the execution of a search warrant at the defen-

dant's house, police found the following items:

> a black Glock .40 caliber semiautomatic pistol equipped with an
> "aftermarket laser sighting device" for nighttime shooting (activated
> by a button on the side of the pistol), a fifteen-round magazine for
> the pistol, ammunition, the defendant's license to carry firearms,
> several police examination manuals, a certificate of completion from
> the student trooper program run by the State police, and a certificate
> of completion from a corrections program, as well as other items.

Id.

At trial a State trooper linked the fourteen shell casings recovered from the scene

as coming from Silva's Glock pistol.  Id.  He also testified that the pistol had been

modified so as to allow the installation of the laser sighting device inside the pistol, and

that the gun would have to be aimed in between shots in order for a round to be

discharged with accuracy.  Id.

Silva testified at trial.  As the SJC described his testimony:

> He said that DeAndrade was out of control and repeatedly
> challenged Padon to a fight. DeAndrade told the defendant to mind
> his own business, and started moving toward him.  The defendant
> heard a car door open, and he saw two figures moving toward him.
> He became concerned for his own safety, having previously been
> stabbed in 1998, after which he began carrying a loaded gun.  He
> tried to flee the scene, but someone chased him.  As footsteps closed
> in on him, he found himself against a fence near the end of the street.
> Thoughts of being trapped and imminent death ran through his mind.
> He turned and saw DeAndrade and Schiano bearing down on him.
> DeAndrade raised his hand as if to grab him.  The defendant shot
> him.  He then shot Schiano, who was "right on top" of him.  The

defendant said he had been so frightened that they had weapons and knives that he fired the pistol rapidly. He could not recall whether he activated the laser sighting device.

The defendant acknowledged that he never saw either man with a weapon, although he thought DeAndrade might have had one based on the way he was lifting his shirt while trying to provoke a fight with Padon. He also acknowledged knowing at the time that the shooting occurred at a "T-bone intersection" of two streets, that is, that he had not run to the end of a dead-end street. He admitted he fired no warning shots, but claimed he was not aiming the gun when he shot DeAndrade and Schiano. The defendant said he routinely carried his pistol with him, fully loaded, with one round in the chamber ready to fire.

The defendant had been employed as a correction officer at the Plymouth County sheriff's department for about eight months in 1993, where he had received firearms training. He had been employed part time as a security guard and a construction worker up to the time of the shootings. He had held a license to carry firearms for twelve years. The defendant considered himself "a pretty good shot," having scored ninety-eight per cent on target shooting during his training. He went target shooting two to three times per year, and most recently three to five days before the shootings. He had studied to become a police officer, had taken several civil service examinations, and was "on the list" for the State police.

Id. at 507-08, 918 N.E.2d at 74-75.

## **Procedural History**

Silva appealed his convictions for first degree murder, armed assault with intent to murder, and assault and battery with a dangerous weapon. While his appeal was pending, he pursued a motion for a new trial, raising, inter alia, a claim of ineffective assistance of counsel, which was denied. Id. at 508-509, 918 N.E.2d at 75. The SJC affirmed the

convictions and the denial of the motion for new trial in a consolidated appeal. Silva's subsequent motion for rehearing was denied. (RA Ex. A at 11).

A second motion for a new trial was filed on December 16, 2010, raising confrontation clause and ineffective assistance of counsel claims following the Supreme Court's decision in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The motion was denied on January 31, 2011. (<u>Id.</u>). Leave to appeal was requested, but denied by a Single Justice of the SJC on April 29, 2011 on the grounds that no substantial claims had been presented. (RA Ex. C). The instant habeas petition was timely filed on May 25, 2011. Silva's <u>pro se</u> petition raised 11 grounds for relief. The Respondent moved to dismiss, alleging that grounds 4, 9 and 10 were not exhausted. Thereafter, a number of motions were filed which need not be described herein. This court appointed counsel for Silva who eventually withdrew ground number 4. This court ruled that grounds 9 and 10 had been exhausted, and denied the motion to dismiss. In connection with the briefing presently before the court, the parties have all used the original numbering of the grounds, simply not addressing number 4. Thus, the petition raises the following grounds for relief:

    1.     Admission of prejudicial, inadmissible evidence, specifically multiple police training manuals of no relevance to the case, in violation of the due process clause;

    2.     Prosecutorial misconduct during the trial, both by improper questioning of witnesses and by making improper argument, in violation of the due process clause;

3.     The seating of jurors who had not been properly vetted for prejudice, in violation of the due process clause;

4.     [Withdrawn];

5.     Deprivation of the right to counsel under the 6th and 14th Amendments where counsel failed to investigate, prepare, and present an adequate defense;

6.     Deprivation of petitioner's rights under the 6th and 14th Amendments where the motion judge post-trial improperly accepted an affidavit and testimony from trial counsel;

7.     Deprivation of due process rights by the judge's failure to properly instruct on the defenses of heat of passion and sudden combat;

8.     Deprivation of the right to counsel under the 6th and 14th Amendments by counsel's failure to exclude hearsay evidence;

9.     Deprivation of the right to confront witnesses under the 6th and 14th Amendments due to the admission of said hearsay evidence;

10.     Deprivation of due process rights where the trial court failed to require a proper foundation prior to admitting said hearsay evidence; and

11.     Deprivation of due process rights where the trial court allowed "expert" witness testimony that was actually hearsay evidence.

(Memorandum in Support of Petition for Habeas Corpus (Docket No. 51) ("Pet. Mem.") at 1-2).

Additional facts will be provided below where appropriate.

## III. ANALYSIS

### A. Standard of Review

The standard of review to be applied to Silva's habeas corpus petition is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The standard allows a federal court to grant a writ of habeas corpus only if the underlying state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In undertaking this analysis, "a habeas court must determine what arguments or theories supported the state court's decision, and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Wetzel v. Lambert, 132 S. Ct. 1195, 1198, 182 L. Ed. 2d 35 (2012) (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (internal punctuation omitted)). Moreover, "[i]n this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta'" of the Supreme Court decisions. Howes v. Fields, 132 S. Ct. 1181, 1187, 182 L. Ed. 2d 17 (2012) (quoting Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000)).

A writ of habeas corpus is only appropriate "under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court]

cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002). By contrast, relief is proper "under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [the Supreme Court] decisions but unreasonably applies it to the facts of the particular case." Id. An unreasonable application is more than just error, entailing "some increment of incorrectness beyond error[.]" McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (internal quotation and citation omitted); accord Bell, 535 U.S. at 694, 122 S. Ct. at 1850. The "increment of incorrectness beyond error" "must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011) (quoting McCambridge, 303 F.3d at 36). Moreover, under this analysis, "a state court is afforded deference and latitude." Hensley v. Roden, 775 F.3d 724, 731 (1st Cir. 2014) (citation omitted).

With respect to factual findings, "the AEDPA sets out a separate and exacting standard applicable to review of a state court's factual findings." Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007) (citing, inter alia, 28 U.S.C. § 2254(e)(1)). Thus, there is a presumption that factual findings by the state court are correct, and the habeas court must defer to such findings. Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001). "[A] habeas petitioner can rebut this presumption by adducing 'clear and convincing evidence'" that convinces the habeas court "that the underlying state court's adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding[.]'" Id. (citing 28 U.S.C. §§ 2254(e)(1) & (d)(2)); see also Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) (petitioner bears the burden of overcoming the presumption of correctness by providing "clear and convincing evidence" of the error).  "Though this means that a federal court will be taking a closer look at a state court's findings of fact, the fundamental principle of deference to those findings still applies." Hensley, 755 F.3d at 731.

Finally, a writ of habeas corpus does not lie for errors of state law.  "Federal habeas is not an ordinary error-correcting writ." Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989).  Rather, it "exists to rescue those in custody from the failure to apply federal rights, correctly or at all." Id.  Thus, habeas relief is only available if a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States"; it "does not lie for errors of state law." Swarthout v. Cooke, 562 U.S. 216, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011) (internal quotations and citations omitted).

Applying these principles to the instant case compels the conclusion that the petition for a writ of habeas corpus should be denied.

**B.      Specific Objections**

**1.      Admission of Police Training Manuals  (Ground 1)**

In his first ground for relief, Silva contends that the admission of three police manuals seized during the search of his residence was so highly prejudicial as to constitute a violation of his due process rights.  Trial counsel had objected to their

admissibility at trial, but had failed to request a limiting instruction.[2] As the SJC

described the issue:

> Three police manuals seized in a search of the defendant's residence were admitted in evidence, over objection and without limitation. They consist of over 850 pages of materials to assist someone preparing for a police officer examination. The defendant argues that these manuals are replete with material unrelated to the case, that they contain material "written by police [and] for police [and] their entire tone was designed to be pro-law enforcement," and that they contain definitions of crimes, including murder and manslaughter, that do not mirror the Model Jury Instructions on Homicide (1999), particularly the absence of a requirement that the Commonwealth disprove beyond a reasonable doubt such matters as self-defense, sudden combat, and heat of passion.

> The Commonwealth contends that the manuals were relevant to show the defendant's familiarity with, and knowledge of, firearms. The Commonwealth further contends that these manuals were merely cumulative of other evidence of the defendant's familiarity with, and knowledge of, firearms, particularly the defendant's certificate of participation in the training program conducted at the State police academy, his certificate of completion of the training program conducted by the house of correction where he had been employed, his gun cleaning kit, and especially the defendant's own testimony on the subject. The Commonwealth argues that any possible misuse of these manuals was averted by the judge's instructions.

Silva, 455 Mass. at 519-20, 918 N.E.2d at 82-83.

---

[2] Silva also contends that counsel's failure to request a limiting instruction constituted ineffective assistance of counsel. The training materials were: The Commonwealth of Massachusetts Human Resources Division Entry Level Police Officer Examination Orientation and Preparation Guide (2001); the Cliffs Police Officer Examination Preparation Guide (1st ed. 1994); and the Arco Police Officer - Written Tests - Physical Exams - Everything You Need to Get Top Test Scores and Launch Your Police Career (15th ed. 2000). Since, at most, any error in their admission was harmless, there was no ineffective assistance of counsel.

The SJC rejected each of the Commonwealth's arguments and ruled that the manuals "should not have been admitted in evidence." Id. at 520, 918 N.E.2d at 83. Thus, the SJC concluded, there was nothing in the manuals from which the jury could have found that Silva had knowledge of, or was familiar with, firearms, or that supported a finding as to the defendant's competence to handle firearms. Id. Since the manuals were erroneously admitted, over objection, the SJC reviewed the issue under the "prejudicial error standard," i.e., ruling that the "court must be able to say with fair assurance that the error did not influence jury, or had but very slight effect." Id. (citing Commonwealth v. Flebotte, 417 Mass. 348, 353, 630 N.E.2d 265 (1994) (quoting Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445, 446 N.E.2d 117 (1983)). After a detailed analysis, the SJC ruled that Silva was not prejudiced by the admission of the manuals. Id. at 522, 918 N.E.2d at 85. While Silva does not challenge the standard applied by the SJC, he does contend that this ruling was an unreasonable application of federal law as defined by the Supreme Court. See Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011) (quoting 28 U.S.C. § 2254(d)(1)) (to obtain federal habeas relief, the petitioner must show that "the state court's adjudication of the petitioner's claim was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."). This court disagrees.

"A state-court decision constitutes an unreasonable application of clearly established federal law if it identifies the correct rule, but applies that rule unreasonably to the facts of the case sub judice." Id. (quoting Janosky v. Amand, 594 F.3d 39, 47 (1st Cir.

2010) (additional citation omitted)).  The parties agree that the appropriate federal rule to be applied here is that "[a]n erroneous evidentiary ruling that results in a fundamentally unfair trial may constitute a due process violation and thus provide a basis for habeas relief."  Lyons v. Brady, 666 F.3d 51, 55 (1st Cir. 2012) (citing Coningford, 640 F.3d at 484).  However, for habeas relief to be warranted, the court's ruling "must be so arbitrary or capricious as to constitute an independent due process violation."  Id. at 55-56 (internal citation and punctuation omitted).  In other words, in order for there to be a constitutional violation, the "state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible."  Id. at 56 (quoting Petrillo v. O'Neil, 428 F.3d 41, 44 n.2 (1st Cir. 2005) (additional citations omitted)).  Finally, only a very narrow category of infractions have been found by the Supreme Court to violate fundamental fairness.  Id.  Applying these standards, the SJC's decision was not arbitrary or capricious, and does not warrant habeas relief.

The SJC undertook a detailed analysis of the record and of Silva's objections in connection with its ruling that there was no prejudice.  As the court ruled:

> The manuals were not written for police officers, as the defendant argues, but for persons interested in taking a written examination to become police officers.  They are not field manuals for police officers.  The ARCO manual contains mostly written examinations that had been used in New York City.  The Cliffs manual contains written examinations for three fictitious cities.  The examinations purport to test a range of skills, including judgment, reasoning ability, reading comprehension, observation  and memory, and writing skills and vocabulary.

The introductory pages of the ARCO and Cliffs manuals contain motivational material that the defendant contends is prejudicial, such as references to police officers being "true knights" and "warrior[s]," and comparisons of police officers to martial artists who fight dragons and win battles, and to "Robin Hood." We view this in much the same way we view enthusiastic rhetoric in a prosecutor's closing—the jury are assumed to have sufficient sophistication to disregard these references or place them in proper perspective. *Commonwealth v. Kozec,* 399 Mass. 514, 517, 505 N.E.2d 519 (1987). The author of the Cliffs manual realized as much when he wrote: "[W]e just don't say it out loud because in today's society it sounds a little corny."

The defendant cites hypothetical scenarios in the manuals that have some similarities to the defendant's case. These hypothetical cases were merely background materials for multiple choice questions in sample reading comprehension tests. They did not suggest what the verdict should be in the defendant's case.

The defendant cites a statement in one manual attributed to an attendee at a police academy class implying that warring drug dealers should be allowed to kill one another. The statement drew laughter among the members of the class, but the instructor quickly interjected his views by explaining why that response was inappropriate. The defendant does not explain how this brief passage prejudiced him, and we fail to see any prejudice. The defendant's case did not involve a war between drug dealers.

The defendant also contends that in the same conversation at the police academy, the instructor had been explaining that the standard weapon issued by many police departments is the Glock nine millimeter pistol, a weapon similar to that used by the defendant, because they hold eighteen to twenty rounds of ammunition in the magazine and thus enable officers to better respond to situations with multiple suspects. The defendant does not explain how he was prejudiced by this information, and we perceive no prejudice.

The ARCO manual contains definitions of self-defense and manslaughter that do not mirror the Model Jury Instructions on Homicide, *supra*, and do not express the proper burden of proof. There are also definitions of probable cause to arrest, serious

physical injury, vehicular homicide, and other concepts having little or nothing to do with this case. Any prejudice from the material was cured by the judge, who told the jury several times during the trial that he was the sole source of the law, and that they must apply the law as he instructed, even if they did not agree with it. See *Commonwealth v. Stone,* 366 Mass. 506, 513, 320 N.E.2d 888 (1974). This instruction was given at the beginning of the jury selection process, in the judge's preliminary instructions immediately after the jury were sworn, and in the final instructions. The jury are presumed to have followed the instruction. *Commonwealth v. Silanskas,* 433 Mass. 678, 702, 746 N.E.2d 445 (2001).

We note that on three separate occasions the jury asked to be instructed on specific aspects of the crimes charged. The third set of questions sought reinstruction on self-defense and mitigating circumstances as they relate to assault and battery by means of a dangerous weapon and armed assault with intent to murder. These questions, asked over two days of deliberations, are some indication that the jury were focused on the judge as the source for the law, and not on some extraneous source. See, e.g., *Commonwealth v. Morales,* 70 Mass.App.Ct. 526, 534, 874 N.E.2d 698 (2007). Moreover, where the jury acquitted the defendant of murder in the first degree under the theory of extreme atrocity or cruelty, we doubt that the manuals had any impact on their ability to take the law solely from the judge.

Finally, it bears noting that the prosecutor never mentioned the police examination manuals in her closing argument. This, combined with the absence of any focus on the manuals at trial, probably suggested to the jury that the manuals were not important to the Commonwealth's case. We conclude that the defendant was not prejudiced by the three police manuals that were erroneously admitted in evidence.

<u>Silva</u>, 455 Mass. at 520-22, 918 N.E.2d at 83-85 (footnote omitted).

Other than contending that this ruling is wrong, Silva does not articulate any per-

suasive argument as to how the admission of the manuals rendered the trial so prejudicial

as to constitute a violation of his Due Process rights.  The SJC set forth a detailed and cogent analysis of why the admission of the manuals, in the context of the trial, did not prejudice Silva.  The record does not support a finding that the SJC's conclusion of lack of prejudice was unreasonable.  Ground 1 does not state a basis for habeas relief.

## 2.    Prosecutor's Conduct  (Ground 2)

Silva next objects to statements made by the prosecutor in her opening statement and closing arguments.  There were no objections to the opening statement and some objections to the closing argument, but not to all the statements challenged herein.  In the absence of an objection, the SJC reviewed the statements "to determine if any misconduct created a substantial likelihood of a miscarriage of justice."  Silva, 455 Mass. at 514, 918 N.E.2d at 79.  The SJC reviewed each challenged statement, found most of them unobjectionable, or otherwise concluded that the error was harmless.  See id. at 514-19, 918 N.E.2d at 79-82.  Silva's argument that "[t]he SJC's determination that the prosecutor's argument herein did not prejudice petitioner was an unreasonable determination of the facts and application of the law" is not persuasive.  (See Pet. Mem. at 9).  The prosecutor's conduct does not warrant habeas relief.[3]

## Procedural Default

_____

[3]  In addition to challenging the SJC's decision on the merits, Silva contends that counsel's failure to object rises to the level of ineffective assistance of counsel.  Since, however, this court finds that admission of the statements at most constitutes harmless error, Silva has not established ineffective assistance of counsel.

As an initial matter, to the extent that there were no objections to the statements made during trial, Silva's present arguments are procedurally defaulted. "Federal habeas relief of a particular claim is precluded in circumstances in which a state prisoner has defaulted on that claim in state court by virtue of an independent and adequate state procedural rule." Janosky v. St. Amand, 594 F.3d 39, 44 (1st Cir. 2010) (citing Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)). It is well established "that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in its courts." Id. The fact that the SJC engaged in a "discretionary miscarriage-of-justice review does not amount to a waiver of the state's contemporaneous objection rule." Id.

Where, as here, claims are procedurally defaulted, they can only be reviewed in connection with this habeas petition if the "petitioner shows either cause for the default and prejudice from the claimed violation of federal law, or that a fundamental miscarriage of justice will result if the claim is not considered." Gunter v. Maloney, 291 F.3d 74, 78 (1st Cir. 2002).[4] "In the habeas context, cause is a term of art. To excuse a procedural default a petitioner's cause must relate to an objective factor, external to the defense, that

_____

[4] The doctrine of procedural default arises out of "the long-standing rule that federal courts do not review state court decisions which rest on 'independent and adequate state ground[s].' Such independent and adequate state grounds exist where 'the state court declined to hear [the federal claims] because the prisoner failed to meet a state procedural requirement.' In such a case, '[c]onsiderations of comity and federalism bar the federal court's review.'" Simpson v. Matesanz, 175 F.3d 200, 205-06 (1st Cir. 1999) (internal citations and punctuation omitted).

thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to

obey the state's procedural rule. Mere attorney error, not amounting to ineffective

assistance in a constitutionally significant sense, is insufficient to constitute cause."

Burks v. Dubois, 55 F.3d 712, 716-17 (1st Cir. 1995) (internal citations omitted). Here

there was no impediment precluding counsel from objecting to the challenged statements.

Therefore, there was no "cause."

Similarly, Silva "cannot meet the high burden of showing actual prejudice. To

scale this wall, a petitioner must demonstrate 'not merely that the errors at . . . trial

created a possibility of prejudice, but that they worked to his actual and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions.'" Ortiz v.

Dubois, 19 F.3d 708, 714 (1st Cir. 1994) (quoting United States v. Frady, 456 U.S. 152,

170, 102 S. Ct. 1584, 1596, 71 L. Ed. 2d 816 (1982)). As detailed further herein, the

record does not support a finding of an error of constitutional dimensions.

Silva also cannot, alternatively, establish that a fundamental miscarriage of justice

will occur if his challenges are not considered on the merits. "It is clear that for habeas

purposes the federal 'fundamental miscarriage of justice' standard means that petitioner

must establish actual innocence." Simpson v. Matesanz, 175 F.3d 200, 210 (1st Cir.

1999) (citing, inter alia, Schlup v. Delo, 513 U.S. 298, 321, 115 S. Ct. 851, 130 L. Ed. 2d

808 (1995)). The petitioner's burden in connection with a claim of innocence "is to

demonstrate that more likely than not, in light of the new evidence, no reasonable juror

would find him guilty beyond a reasonable doubt – or, to remove the double negative,

that more likely than not any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077, 165 L. Ed. 2d 21 (2006).  Review of a case in light of a claim of actual innocence occurs only in the "extraordinary case." Id. at 536, 126 S. Ct. at 2076 (internal citation omitted).  "Reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" is necessary to mount an actual innocence claim. Id. at 537, 126 S. Ct. at 2077 (quoting Schlup, 513 U.S. at 324, 115 S. Ct. at 865).  In the instant case, Silva has not presented any argument or facts in support of a claim of innocence.  Therefore, to the extent that there were no objections taken to the prosecutor's opening or closing, Silva's present objections are procedurally defaulted.

## The Challenged Statements

Since the SJC reviewed all of the challenged statements, whether objected to or not, this court will as well.  The federal constitutional standard to be applied to the claims of prosecutorial misconduct was recently described by the First Circuit as follows:

> In habeas jurisdiction, our focus is "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) (internal quotation mark omitted).  The clearly established law in this area is exemplified by the Supreme Court's decision in *Darden v. Wainwright,* 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).  Under *Darden,* the constitutional test is whether the prosecutor's alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 181, 106 S. Ct. 2464 (quoting *Donnelly,* 416 U.S. at 643, 94 S. Ct. 1868).  This is a case-specific inquiry; "[t]here is no precise federal standard governing due process claims based on a prosecutor's remarks." *Dagley v. Russo,* 540 F.3d 8, 15 n.3 (1st Cir. 2008).

Magraw v. Roden, 743 F.3d 1, 9-10 (1st Cir. 2014), cert. denied, 134 S. Ct. 2711 (U.S. 2014).  See also Parker v. Matthews, __ U.S. __, 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (standard set forth in Darden is the "clearly established Federal law" to be applied in habeas petition challenging prosecutor's closing argument).  There is no dispute in the instant case that the SJC applied the appropriate standard.  Rather, Silva contends that the SJC's application of the appropriate standard was unreasonable.  This court disagrees.

With respect to the opening (for which there was no contemporaneous objection), Silva objects to the prosecutor's statement that "the evidence would show that the defendant shot both victims 'in cold blood' and left one of them to die, all over a fifteen-dollar drug debt."  Silva, 455 Mass. at 514, 918 N.E.2d at 79.  (See also Pet. Mem. at 9).  He also objects to the description of the shooting of Schiano as a "slaughter."  Id. (prosecutor stated in her opening that a witness had a "bird's eye view of the slaughter of Jimmy Schiano").  The SJC found that describing the killing as "cold blooded" and as a "slaughter" went beyond the proper function of an opening, which was "to outline in a general way the nature of the case which the counsel expects to be able to prove or support by the evidence."  Silva, 455 Mass. at 514-15, 918 N.E.2d at 79 (quotation and citation omitted).  Nevertheless, the SJC found no error of a constitutional dimension.

The SJC found that calling the killing "cold blooded" "was little more than an expression of her [the prosecutor's] theory that the killing was committed with deliberately premeditated malice aforethought, and was not, as she stated in her opening, one of provocation, justification, or excuse."  Id. at 514, 918 N.E.2d at 79.  Thus, the SJC ruled,

the statement "was otherwise firmly and fairly grounded on what she reasonably expected to prove and did not create a substantial likelihood of a miscarriage of justice." Id. (internal citation omitted). Similarly, the SJC concluded that while the prosecutor's description of the shooting of an unarmed man may have been improper for an opening, it did not create a substantial likelihood of a miscarriage of justice. Id. at 515, 918 N.E.2d at 79. This court agrees that in light of the evidence that the government expected to prove, namely that Silva "gunned down two unarmed men without provocation, without justification, without excuse[,]" the improper description of the event in the opening as "cold-blooded" or a "slaughter" did not so "infect the trial with unfairness" as to rise to the level of a constitutional violation. See id. at 514, 918 N.E.2d at 79.

In his habeas petition, Silva also objects to the prosecutor's description of the killing as "cold blooded" in her closing, although there was no objection at trial. (Pet. Mem. at 9). See also Silva, 455 Mass. at 517, 918 N.E.2d at 81. The SJC concluded that this "was entirely proper argument in the closing" and Silva has not cited any law to the contrary. See id. In any event, given the evidence showing that the jury could have found that the "murders were unprovoked, senseless, and brutal[,]" id., the description of the killing as "cold blooded" was not so inflammatory as to violate Silva's constitutional rights.

Silva further objects to the prosecutor's closing argument (to which there was an objection) that "when you prosecute a case in hell, you don't have angels for witnesses." (Pet. Mem. at 9). The SJC ruled that this argument "was in response to defense counsel's

aggressive attacks on the credibility of Commonwealth witnesses.  This statement was a variation of an age-old expression used by prosecutors to acknowledge the credentials of certain witnesses as less than desirable.  Far from constituting impassioned rhetoric designed to inflame the emotions of the jury, the comment appears to refer to the character of several witnesses, and in this respect it had factual basis and constituted permissible argument."  Id. at 515, 918 N.E.2d at 80 (internal citation omitted).  Silva has cited no cases, and none have been found, finding this statement to be so inflammatory as to violate a defendant's constitutional rights.

The SJC did agree with the Petitioner's further objection that "there was no evidentiary support for the prosecutor's reference to a plot 'to get DeAndrade over to the house' once the defendant arrived."  Id. at 517, 918 N.E.2d at 81.  The SJC reviewed the record and concluded that the prosecutor was "plainly confused" by some testimony on which she based her argument.  Id. at 518, 918 N.E.2d at 81.  There was no contemporaneous objection to this argument at trial.  The SJC ruled, "[w]e do not think this argument created a substantial likelihood of a miscarriage of justice because it was an incidental aspect of her argument as a whole, and the prosecutor quickly turned to what occurred between DeAndrade and the defendant.  It did not likely affect the outcome of the case.  The judge's instruction that opening statements and closing arguments were not evidence, and that the jury's recollection of the evidence was controlling, cured any possible prejudice."  Id.  The consideration of these factors, and the SJC's conclusion, is consistent with Supreme Court law and does not state a constitutional violation.  See

Dagley v. Russo, 540 F.3d 8, 17 (1st Cir. 2008) (in assessing whether a prosecutor's comments rise to the level of a constitutional violation, the Supreme Court "consider[s], inter alia, the seriousness of the improper remark, the context in which the statement was made, the court's response or curative instruction, and the effect of the statement on the overall proceeding.") (citing Donnelly, 416 U.S. at 644-47, 94 S. Ct. at 1872-73).

Finally, Silva cursorily links all of his remaining objections to the prosecutor's closing, and argues that her statements constituted "consistently inflammatory assertions." (Pet. Mem. at 10). As he describes the statements to which he objects:

> She [the prosecutor] further argued that even if Schiano had been drinking beer in public and smoking dope "the penalty in Massachusetts for that is not the death penalty." She argued that because petitioner was friends with Padon and Soloway, the jury should infer he was also doing drugs. She argued that Schiano was shot in the back, and that petitioner was acting as a "good backup security officer," and called the gun he was using a "cannon." She improperly asked the jury to find that the residential character of the neighborhood made this a particularly bad killing.

(Id.). Each of these statements was addressed by the SCJ, and either found to be supported by the record or to be harmless error.

Specifically, the Court found that the description of the gun as a "cannon" fell into the category of "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," which was not grounds for reversal. Silva, 455 Mass. at 515, 918 N.E.2d at 79 (quotation and citation omitted). Moreover, the court concluded that it was appropriate for the jury to infer that the gun was powerful in light of the evidence that it was a "large-caliber weapon with significant recoil of approximately eighteen inches after each firing." Id. at

515, 918 N.E.2d at 80.  In addition, the Court ruled that "[t]he prosecutor's description of

the defendant as a 'good backup security officer' was based on evidence that the

defendant was employed as a security officer and on Padon's testimony that he called the

defendant and asked him to come by to 'watch my back.'  There also was evidence that

Schiano had been shot in the back of the head, providing a basis for the prosecutor to

argue that the defendant shot him when he was posing no threat.  In each instance the

prosecutor properly was 'marshal[ing] the evidence and suggest[ing] inferences that the

jury may draw from it.'"  Id. at 516, 918 N.E.2d at 80 (quoting Commonwealth v.

Drayton, 386 Mass. 39, 52, 434 N.E.2d 997 (1982)).  With respect to the other

objections, the SJC continued:

> The defendant asserts that the prosecutor overstepped her bounds
> when she argued that while "Schiano had the audacity to smoke
> some dope, and drink some beer ... the penalty in Massachusetts for
> that is not the death penalty."  The comment was made in response
> to defense counsel's repeated references to the drugs Schiano and
> DeAndrade had consumed, and his repeated description of
> DeAndrade's car as a "pharmacy ... of illegal narcotics."  Defense
> counsel had not argued that the drugs affected credibility, but instead
> implied that Schiano was in a stupor and was partly to blame for his
> own death.  The prosecutor's argument suggested that the jury focus
> on the actions of Schiano as they related to the defendant, not on the
> fact that he may have consumed illegal drugs.  She later recalled the
> testimony of the witness with the "bird's-eye view," who said she
> saw one man shoot an unarmed man who was gesturing with his
> hands as a plea to the shooter to stop.  We conclude that the argu-
> ment was grounded in the evidence and fairly asked the jury to
> disregard defense counsel's reference, as argued, to drugs.
>
> The defendant takes issue with that portion of the prosecutor's
> closing argument that characterized as unbelievable the defendant's
> testimony that he was unaware of Padon's and Soloway's drug use.

She was not arguing, as the defendant contends, that he, the defendant, was a drug user. She was challenging his credibility as a witness by suggesting his testimony on the issue of their drug use was implausible because Padon and Soloway used drugs regularly, the defendant was a frequent visitor to their apartment, and therefore he must have known they used drugs. The inference she was asking the jury to draw was based on the evidence. It was reasonable and fair. See *Commonwealth v. Kozec,* 399 Mass. 514, 516, 505 N.E.2d 519 (1987), citing *Commonwealth v. Earltop,* 372 Mass. 199, 205, 361 N.E.2d 220 (1977) (Hennessey, C.J., concurring).

Finally, the defendant faults the prosecutor for her reference to the congested, residential nature of the neighborhood in which the defendant repeatedly discharged his firearm. He argues that the prosecutor impermissibly asked the jury to consider this as evidence of his indifference to the victim's suffering, a factor that may be considered when deciding if murder was committed with extreme atrocity or cruelty. See *Commonwealth v. Cunneen,* 389 Mass. 216, 227, 449 N.E.2d 658 (1983). The Commonwealth contends that this was fair argument because the point the prosecutor was making was that the defendant's indifference to the disruption of the tranquility of the neighborhood that this shooting would cause was probative of his indifference to Schiano's suffering. The nexus the Commonwealth urges is not reasonable. The Commonwealth may not support a conviction of murder with extreme atrocity or cruelty with evidence of indifference to neighborhood tranquility, and it was wrong to ask the jury to do so. We think there was no prejudice because the argument was rather weak, but more importantly, the jury appear not to have been swayed because they did not convict the defendant under that theory.

Id. at 516-17, 918 N.E.2d at 80-81. In light of the SJC's careful review, there is no basis for a finding of a constitutional violation. Again, while Silva urges this court to find the SJC's decision wrong, he offers no evidence or persuasive argument showing that the prosecutor's comments (most of which were supported by the record) so inflamed the jury as to create an improper verdict in violation of his constitutional rights.

Finally, the Petitioner objects to the state court's decision on the grounds that the SJC considered each objection individually, and did not assess the cumulative effect of the various errors. It is well established that even where individual errors may not require reversal, a combination of errors may "disfigure the proceedings so significantly as to undermine our confidence that the defendant received a fair trial." United States v. Gonzalez-Melendez, 594 F.3d 28, 37 (1st Cir. 2010) (citing United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993)). "In considering a claim of cumulative error, we look to the impact of a number of variables, such as the nature and number of the errors, their interrelationship, if any, how the [trial] court dealt with the errors as they arose, the length of the trial, and the strength of the government's case." Id.

Contrary to Silva's argument, the SJC did assess the cumulative effect of the errors made, and did apply the appropriate standard. As the SJC concluded in connection with its review under Mass. Gen. Laws ch. 278, § 33E:

> Although there were numerous errors, we are satisfied that, in the aggregate, they did not create a substantial likelihood of a mis-carriage of justice.... The defendant made much of the police examination manuals, but the prosecutor never directed the jury's attention to any portion of them during the trial, and we are satisfied that they did not create any prejudice. We have carefully reviewed the briefs, the entire record, and the transcripts, and we are satisfied the defendant received a fair trial, at which he was represented by competent counsel. The verdict of deliberately premeditated murder was supported by the weight of the evidence, consistent with the law, and consonant with justice. We see no reason to reduce the degree of guilt or order a new trial

Silva, 455 Mass. at 529, 918 N.E.2d at 89. Whether viewed individually or collectively, the prosecutor's arguments did not so infect the trial as to preclude Silva from receiving a fair trial. The case does not present "egregious misconduct" which would "amount to a denial of constitutional due process." Donnelly, 416 U.S. at 647-48, 94 S. Ct. at 1873.

### 3.  **Investigation of Jurors  (Ground 3)**

It is well established that "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751 (1961). As his third ground for habeas relief, Silva argues that he was denied "a fair trial by a panel of impartial, 'indifferent' jurors" as a result of the trial judge's refusal to ask three sets of questions to each juror individually: (1) whether the prospective juror or any member of the prospective juror's family, or a close acquaintance, had ever been the victim of a crime and, if so, what crime, and whether that experience would affect the prospective juror's ability to render a fair and impartial verdict; (2) whether the prospective juror or any member of the juror's family, or a close acquaintance, ever worked for a law enforcement agency and, if so, the details of such employment; and (3) whether the prospective juror would find the testimony of a police officer more credible than that of a civilian witness simply because of his or her position as a police officer." Silva, 455 Mass. at 512, 918 N.E.2d at 77. (See also Pet. Mem. at 11-12). The SJC considered Silva's challenge in detail, and applied the appropriate standard in reviewing the jury selection process, i.e., whether the questions were "necessary reasonably to ensure that a particular jury can weigh and view

the evidence impartially." Silva, 455 Mass. at 513, 918 N.E.2d at 78 (quoting Common-

wealth v. Lopes, 440 Mass. 731, 736, 802 N.E.2d 97, 102 (2004)). The SJC found no

error. Silva's arguments to the contrary are not compelling.

Silva argues as follows:

> In order to determine whether a particular juror was biased or not, it was imperative to know how they would judge police officer's testimony, and their opinion of police officers in general, especially where ... the improper admission of the police manuals introduced significant irrelevant and prejudicial information regarding the role of police officers. Similarly, it was necessary to know whether that juror was ever involved as a victim of a violent crime, and without that information it was impossible to determine if the jurors were indifferent, as due process requires. When presented with the additional prejudicial material which exists in that evidence, the jurors needed to be particularly well vetted as to their opinions regarding police officers, and the state courts' failure to ensure that vetting took place was an unreasonable failure to provide petitioner with the panel of impartial jurors the Supreme Court has held are required for a trial. The *habeas* petition must be allowed on this ground.

(Pet. Mem. at 13). However, the SJC considered, and rejected, these arguments. Thus,

the SJC ruled that the proposed questions were not mandated by any state law, as a result

of which "the scope of jury voir dire rests in the sound discretion of the trial judge[.]"

Silva, 455 Mass. at 512, 918 N.E.2d at 78. Although the proposed questions had been

recommended (but not mandated) by the SJC in other cases, in Silva's case other

questions posed by the trial judge, along with the confidential questionnaire, were

sufficient and "covered much of what the defendant had sought from the three questions

he had requested." Id. at 512-13, 918 N.E.2d at 78. Further, the SJC concluded that

Silva's case "did not turn on police officer credibility" as the police were not percipient witnesses and Silva did not materially challenge the police testimony at trial. Id. at 513, 918 N.E.2d at 78. There was no error in the SJC's analysis, much less an error of constitutional dimensions.

As an initial matter, this habeas court has very limited authority to review voir dire questions in state court cases. As the First Circuit explained in Kater v. Maloney, 459 F.3d 56 (1st Cir. 2006):

> The Supreme Court has explained that federal authority over voir dire in cases tried in state courts is "limited to enforcing the commands of the United States Constitution." *Mu'Min v. Virginia,* 500 U.S. 415, 422, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991). So far, the Supreme Court has recognized a defendant's constitutional right to voir dire questioning only about whether jurors might be prejudiced against defendant because of his race. *See Ham v. South Carolina,* 409 U.S. 524, 526–27, 93 S. Ct. 848, 35 L. Ed. 2d 46 (1973); *Aldridge v. United States,* 283 U.S. 308, 314–15, 51 S. Ct. 470, 75 L. Ed. 1054 (1931). Even then, the inquiry in non-death-penalty cases need not be made in every state court case in which the races of the victim and the defendant are different. *Ristaino v. Ross,* 424 U.S. 589, 597–98, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976); *see generally* 5 LaFave, et al., *Criminal Procedure* § 22.3(a), at 293 (2d ed. 1999) ("[T]he Court has as yet declined to extend the [*Ham* ] doctrine to matters other than racial prejudice.").

Id. at 66 (footnote omitted). In the instant case, Silva does not assert any potential prejudice due to his race. Therefore, Silva's challenge to the voir dire does not rise to the level of a federal constitutional claim, and to the extent that he is alleging an error based on state law, it is "not within the reach of federal habeas petitions." Id. at 61; accord Sargent v. Bissonnette, Civil Action No. 03-11124-RGS, 2011 WL 487779, at *12 (D.

Mass. Jan. 10, 2011) (finding that alleged error in failure to ask voir dire questions regarding neither race nor the death penalty did not state a constitutional claim recognizable in a habeas petition).

Assuming further analysis is appropriate, Silva has not established any basis for disturbing the SJC's finding that the trial judge took sufficient steps to seat a fair and impartial jury. As the SJC ruled:

> The confidential juror questionnaire asked each member of the venire his or her present or past involvement as a party to civil or criminal litigation, and his or her relationship to a police or law enforcement officer. See G.L. c. 234A, § 22. The judge asked the venire whether "the nature and seriousness of these charges make it difficult for you to render a fair and impartial verdict?" He also asked if there was "any reason at all why you would not be completely impartial in this case and be able to render a true and just verdict based solely on the evidence and the law that I'll instruct you on at the end of the trial? Any reason at all why you couldn't be completely fair and impartial in this case to both sides?" See G.L. c. 234, § 28. These questions covered much of what the defendant had sought from the three questions he had requested, and nothing further was required by this case.

Silva, 455 Mass. at 513, 918 N.E.2d at 78. "No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*" and jury selection " is particularly within the province of the trial judge." Skilling v. United States, 561 U.S. 358, 386, 130 S. Ct. 2896, 2917, 177 L. Ed. 2d 619 (2010) (internal quotation and citation omitted). The SJC's decision was not an unreasonable application of clearly established federal law as determined by the Supreme Court.

### 4.    Ineffective Assistance of Counsel  (Grounds 5 and 6)

Silva contends that he was denied effective assistance of counsel because trial counsel failed to properly impeach DeAndrade and two other prosecution witnesses, Brooke Canella and Katie Field, on the basis of their criminal records and prior inconsistent statements. (Pet. Mem. at 14-15). In addition, he argues that trial counsel improperly prepared him to testify, and told him that he had to testify instead of allowing him to make his own decision. (Id. at 15). The error was compounded, according to Silva, by the trial court's acceptance of an affidavit from counsel describing what he allegedly told Silva, without first allowing Silva the opportunity to seek a protective order, allegedly in violation of the Rules of Professional Conduct. (Id.).[5] In the state court, Silva had asserted that the affidavit violated the attorney-client privilege. All of Silva's objections were thoroughly reviewed and rejected by the SJC. Silva has not raised a basis for habeas relief.

## Standard of Review

---

[5] Silva's claim of ineffective assistance of counsel was first raised in his motion for a new trial, and, since the trial judge had retired by that time, the motion was decided by a different judge after an evidentiary hearing. Silva, 455 Mass. at 526, 918 N.E.2d at 87. In addition to the challenged conduct described above, Silva asserted additional grounds in support of his ineffective assistance of counsel claims, including the failure to object to some of the prosecutor's arguments, failing to request jury instructions and failing to request a limiting instruction with respect to the admission of the police manuals. (See Pet. Mem. at 14 n.11). Silva does not address these arguments in the context of his claim of ineffective assistance of counsel, but, rather, addresses them in connection with the specific grounds for habeas relief based on these alleged errors. (Id.). This court has done likewise. Since, as detailed elsewhere, this court has concluded "either that there was no error, or that the error would not likely have influenced the jury's conclusion[,] ... these claims cannot be the basis for a determination of ineffective assistance of counsel." Silva, 455 Mass. at 528, 919 N.E.2d at 88.

The well-recognized standard for ineffective assistance of counsel is set forth in

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). As the

Strickland court held, to establish a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was defi-
> cient. This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the defen-
> dant by the Sixth Amendment. Second, the defendant must show that
> the deficient performance prejudiced the defense. This requires
> showing that counsel's errors were so serious as to deprive the defen-
> dant of a fair trial, a trial whose result is reliable. Unless a defendant
> makes both showings, it cannot be said that the conviction ... resulted
> from a breakdown in the adversary process that renders the result
> unreliable.

Id. at 687, 104 S. Ct. at 2064. See also Knowles v. Mirzayance, 556 U.S. 111, 122, 129

S. Ct. 1411, 1419, 173 L. Ed. 2d 251 (2009) ("defendant must show both deficient per-

formance and prejudice in order to prove that he has received ineffective assistance of

counsel") (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). "Under the first prong

of Strickland, there is a 'strong presumption' that counsel's strategy and tactics fall 'within

the range of reasonable professional assistance,' and courts should avoid second-guessing

counsel's performance with the use of hindsight." Knight v. Spencer, 447 F.3d 6, 15 (1st

Cir. 2006) (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). "It is only where,

given the facts known at the time, counsel's choice was so patently unreasonable that no

competent attorney would have made it, that the ineffective assistance prong is satisfied."

Id. (quotations and citation omitted).

"Under the prejudice prong, not all errors by counsel are sufficient to meet the standard of a reasonable probability that, but for the counsel's errors, the result of the proceeding would have been different." Id. The probability must be "sufficient to undermine confidence in the outcome," and the burden is a "heavy" and "highly demanding" one. Id. (internal quotations and citations omitted). "A defendant's failure to satisfy one prong of the Strickland analysis obviates the need for a court to consider the remaining prong." Id.

In the instant case, the SJC applied the "standard of a substantial likelihood of a miscarriage of justice" applicable in appeals of first degree murder convictions to Silva's claims of ineffective assistance of counsel. See Silva, 455 Mass. at 526, 918 N.E.2d at 87. This standard is more favorable to the defendant than the Strickland standard detailed above. See id.; Knight v. Spencer, 447 F.3d at 10-11. Therefore, Silva cannot (and does not) argue that the SJC applied the wrong standard in reviewing Silva's claim. Rather, his contention is that the state court's application of this standard was unreasonable. This argument is not persuasive.

### Cross-Examination of Witnesses

In his habeas petition, as he did in his state court motion for a new trial, Silva argues "that counsel failed to ask DeAndrade and Brooke Canella, a passenger in DeAndrade's car, about criminal cases that were pending against them at the time of the defendant's trial, that he failed to impeach them with certified copies of their prior convictions, and that he failed to impeach them with prior inconsistent statements." Silva,

455 Mass. at 526, 918 N.E.2d at 87. The SJC reviewed the trial testimony in detail, concluding that Silva's objections were not supported by the record.

With respect to the cross-examination of DeAndrade, the SJC explained that DeAndrade had been cross-examined about his prior convictions extensively, as well as about his open criminal charges. Id. at 526-27, 918 N.E.2d at 87-88. In addition, the SJC concluded that impeachment of DeAndrade with some inconsistent statements was rendered unnecessary by counsel's elicitation of testimony from DeAndrade that was directly contradicted by other witnesses' testimony. Id. at 527, 918 N.E.2d at 88. The SJC concluded, "counsel's cross-examination of DeAndrade was effective and thorough, and he did not need to make use of every possible technique or every available item. He attacked DeAndrade in the areas where he was most vulnerable, and downplayed the areas of his strength as a witness: he had been shot five times while unarmed." Id. Silva has not proffered any arguments which would compel a different conclusion.

The SJC also reviewed the cross examination of Brooke Canella in detail, including her testimony about the prior convictions she recalled, and the fact that there might be others she did not recall, the fact that she was drunk at the time of the shooting and had been smoking marijuana all day, and the fact that her recollection of events was faulty. Id. at 527-28, 918 N.E.2d at 88. As the SJC concluded, "[i]mpeaching a witness with a prior inconsistent statement, presumably to challenge her credibility, is less fruitful where the witness already has been impeached with prior convictions, evidence of intoxication, and faulty memory." Id. The SJC found that trial counsel had made a tactical decision not to

spend time "offering certified copies of records of convictions for those [Canella] could not remember, or calling a police officer to testify about her prior statement" since she had already been sufficiently discredited.  Id. at 528, 919 N.E.2d at 88.  Furthermore, the SJC found that the tactical decision "was not manifestly unreasonable."  Id.  This court agrees. Silva has not established ineffective assistance of counsel based on the examination of witnesses.[6]

### Trial Counsel's Affidavit

Silva's objection to trial counsel's affidavit as constituting ineffective assistance of counsel fares no better.  As an initial matter, Silva has not stated a claim for habeas relief. To the extent that he objects to the content of the affidavit as violating the attorney-client privilege, he has not established a constitutional violation.  The "attorney-client privilege is a creation of the common law, not the Constitution[,]" and a state court ruling as to the

---

[6] Silva also asserts in passing that the prosecution's witness, Katie Field, "made prior inconsistent statements to the police, which trial counsel did not confront or impeach [her] with." (Pet. Mem. at 14-15).  He has not offered any details about this testimony, either in his habeas petition or in connection with his motion for a new trial.  (See RA Ex. E at 53 ("where Brooke Canella and Katie Fields made statements to the police [that] were either inconsistent with their present in court testimony or involved statements which reflected negatively on the witness's credibility, defense counsel failed to impeach these witnesses with their prior inconsistent statements.")).  While the SJC did not address Ms. Field's testimony in particular, it did review "the briefs, the entire record, and the transcripts" before concluding that "the defendant received a fair trial, at which he was represented by competent counsel."  Silva, 455 Mass. at 529, 918 N.E.2d at 89.  Silva has not established that there was anything in the cross-examination of Ms. Field that rose to the level of ineffective assistance of counsel.  (See also Commonwealth's Brief to the SJC (Resp. Ans., Ex. A at 65) (trial counsel "displayed his familiarity with witnesses' prior extrajudicial statements when, for example, he questioned Katie Field and Cannella at length regarding the timing of Schiano's exit from the car") (record citations omitted)).  Therefore, Silva has not established that the cross-examination of Ms. Field warrants habeas relief.

scope of the attorney-client privilege does not state a cognizable habeas claim.  See Lange v. Young, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989), and cases cited; accord Smith v. Moore, 137 F.3d 808, 819 (4th Cir. 1998) ("Because federal habeas review is limited to violations of the United States Constitution or its law and treaties, a mere violation of [petitioner's] attorney-client privilege would not warrant habeas relief") (internal quotation marks and citation omitted); Sanborn v. Parker, 629 F.3d 554, 576-77 (6th Cir. 2010) (finding that violation of attorney-client privilege raises a state law issue and is not a basis for habeas relief).  Similarly, his objection that his counsel may have violated the notice protocol of the Rules of Professional Conduct by providing the affidavit without giving him prior notice simply asserts a state law violation.  Therefore, there is no basis for reviewing Silva's challenge to his counsel's affidavit in the context of Silva's habeas petition.

Even if this court were to reach the merits of Silva's claim, there was no error.  In response to Silva's assertion that he was inappropriately advised by trial counsel about his right not to testify, and was ineffectively prepared to testify, trial counsel filed an affidavit which was considered by the court in connection with Silva's motion for a new trial.  Silva objected that the affidavit disclosed matters covered by the attorney-client privilege.  As the SJC ruled after reviewing all the relevant facts:

> Because the defendant essentially accused trial counsel of incompetence in circumstances covered by the attorney-client privilege and to which the only witnesses were the defendant and trial counsel, the privilege must be deemed waived, in part, to permit counsel to disclose only those confidences necessary and relevant to the defense

> of the charge of ineffective assistance of counsel.  See *Common-*
> *wealth v. Brito,* 390 Mass. 112, 119, 453 N.E.2d 1217 (1983);
> *Commonwealth v. Woodberry,* 26 Mass.App.Ct. 636, 637, 530
> N.E.2d 1260 (1988).  The motion judge carefully reviewed counsel's
> affidavit and noted that it disclosed no more than was necessary to
> address the claims of ineffective preparation of the defendant for
> testimony. There was no error.

Silva, 455 Mass. at 529, 918 N.E.2d at 89.  Silva has not put forth any facts or argument to

challenge this conclusion.

Silva's reliance on Mass. R. Prof. Conduct 1.6 in support of his contention that he

was entitled to notice before counsel filed his affidavit also is misplaced.  (See Pet. Mem.

at 15).  There was no requirement of prior notice in light of the context in which the

affidavit was provided.  The Rule states that a "lawyer shall not reveal confidential

information relating to representation of a client unless the client consents after consulta-

tion, except" where disclosure is authorized by the Rule.  Mass. R. Prof. Conduct 1.6(a)

(emphasis added).  The Rule further authorizes the disclosure of confidential information

"to the extent the lawyer reasonably believes necessary to establish a claim or defense on

behalf of the lawyer in a controversy between the lawyer and the client . . . or to respond

to allegations in any proceeding concerning the lawyer's representation of the client[.]"

Id. at Rule 1.6(b)(2).  Since disclosure by Silva's counsel was authorized under this Rule

in order to respond to Silva's challenge to his counsel's representation, there was no

obligation under the Rule for prior consultation with Silva before the filing of the

affidavit.

Finally, Silva has not established that the state court's consideration of the affidavit was unreasonable, nor has he established that it was ineffective assistance of counsel for his attorney to provide the affidavit in response to the charges Silva made. Silva has not purported to identify any violation of a federal constitutional standard. Therefore, Silva has not established that he is entitled to habeas relief because of the filing or consideration of counsel's affidavit.

### 5. Jury Instruction on Murder Charge (Ground 7)

In his seventh ground for relief, Silva argues that, even ignoring the improper definition of murder found in the inappropriately admitted police manual discussed supra,[7] the fact that the trial judge provided three different versions in the jury instructions relating to provocation and self-defense rendered his trial fundamentally unfair. (Pet. Mem. at 15-17).[8] The SJC addressed this contention in detail and concluded that while there were some errors in the charge, they did not require a reversal of the conviction.

---

[7] The SJC found that one of the manuals contained definitions of self-defense and manslaughter that did not mirror the Model Jury Instructions on Homicide and did not express the proper burden of proof. Silva, 455 Mass. at 522, 918 N.E.2d at 84. The court concluded that if there was any prejudice, it "was cured by the judge, who told the jury several times during the trial that he was the sole source of the law, and that they must apply the law as he instructed, even if they did not agree with it." Id.

[8] During his original charge to the jury, the trial judge omitted a number of relevant instructions. Silva, 455 Mass. at 523, 918 N.E.2d at 85. Before deliberations began, he held a side bar conference with counsel, after which he amended his instructions. Id. Then during the first day of deliberations the jury returned twice with questions, the second one being at the end of the day. Id. at 523-24, 918 N.E.2d at 85. The next day started with the judge re-instructing the jury. Id. at 524, 918 N.E.2d at 85-86. The jury returned a third time with another question about the instructions, after which they were instructed again. Id.

<u>Silva</u>, 455 Mass. at 524-29, 918 N.E.2d at 86-89. Silva has failed to establish that the SJC's decision was an unreasonable application of federal law as defined by the Supreme Court, and he is not entitled to habeas relief.

As a general statement, "instructions that contain errors of state law may not form the basis for federal habeas relief." <u>Gilmore v. Taylor</u>, 508 U.S. 333, 342, 113 S. Ct. 2112, 2117, 124 L. Ed. 2d 306 (1993). Thus, it has been long recognized by the Supreme Court that a challenge to the correctness of self-defense instructions under state law does not state a basis for federal habeas relief. <u>See</u>, <u>e.g.</u>, <u>Engle v. Isaac</u>, 456 U.S. 107, 119, 102 S. Ct. 1558, 1567, 71 L. Ed. 2d 783 (1982) ("Insofar as respondents simply challenge the correctness of the self-defense instructions under Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief."). In the instant case, Silva contends that the confusion allegedly caused by the trial judge's instructions rendered the trial unfair. To the extent that he is challenging the accuracy of the charge with respect to the elements of a state law crime, he has failed to state a federal habeas claim. To the extent he is arguing that the instructions were confusing, the constitutional standard is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368 (1973). Silva has not put forth any argument which would support such a finding, and this court finds no error in the SJC's analysis, much less an error of constitutional dimensions.

**<u>The Charge on Mitigating Circumstances</u>**

As detailed by the SJC, there were two fundamental problems with the jury instructions. The first error was that, in connection with his original instructions on mitigating circumstances that may serve to mitigate malice and reduce murder to manslaughter, the judge omitted any reference to "heat of passion induced by reasonable provocation or sudden combat, both of which were warranted by the evidence." Silva, 455 Mass. at 523, 918 N.E.2d at 85. Following a sidebar conference, the judge instructed the jury, without objection, that, "with respect to murder, the Commonwealth must prove beyond a reasonable doubt the absence of mitigating circumstances, namely, heat of passion induced by reasonable provocation and sudden combat, and excessive use of force in self-defense," but gave no explanation of these terms. Id. "The judge also instructed that self-defense was 'available' on all the charges, not just murder." Id. The next day, in response to a jury question, the judge gave complete instructions in conformity with the Model Jury Instructions on Homicide. Id. at 524, 918 N.E.2d at 85-86. In finding no substantial likelihood of a miscarriage of justice in connection with these instructions, the SJC concluded as follows:

> Although the judge's initial instructions on mitigating circumstances contained no reference to heat of passion induced by reasonable provocation or sudden combat, this was immediately corrected, although in abbreviated form. However, the next day, in response to the jury's question, the judge reinstructed the jury correctly and conformably with the Model Jury Instructions on Homicide, *supra*, and this was the last instruction the jury heard. We have held in more compelling circumstances involving two irreconcilable instructions that, considering the charge as a whole, if the instructional center of gravity falls on the side of the correct instruction, there is no substantial likelihood of a miscarriage of justice. See *Commonwealth v.*

> *Fickling,* 434 Mass. 9, 18–20, 746 N.E.2d 475 (2001). See also
> *Commonwealth v. Wallis,* 440 Mass. 589, 594, 800 N.E.2d 699
> (2003); *Commonwealth v. Torres,* 420 Mass. 479, 488–491, 651
> N.E.2d 360 (1995). Here, the initial error was an omission in a
> portion of the mitigation instruction, not a conflicting instruction. It
> was almost instantly corrected, although in abbreviated form, and
> then thoroughly corrected the next day. There was no repetitive
> oscillation between correct and incorrect instructions, but a steady
> progression toward a correct and thorough instruction on mitigating
> factors. We conclude there was no substantial likelihood of a
> miscarriage of justice.

Id. at 524-25, 918 N.E.2d at 86. Silva has not established that this conclusion was an

unreasonable application of Supreme Court law.

The SJC applied the appropriate federal standard. The Fifth and Sixth Amend-

ments to the U.S. Constitution "require criminal convictions to rest upon a jury determina-

tion that the defendant is guilty of every element of the crime with which he is charged,

beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 509-10, 115 S. Ct.

2310, 2313, 132 L. Ed. 2d 444 (1995). The Constitution does not require perfect instruc-

tions, nor does it guarantee that there will be no inconsistencies in a charge. Rather, it is

well recognized "'that a single instruction to a jury may not be judged in artificial isola-

tion, but must be viewed in the context of the overall charge.'" Allen v. Massachusetts,

926 F.2d 74, 79-80 (1st Cir. 1991) (quoting Cupp v. Naughten, 414 U.S. at 146-47, 94

S. Ct. at 400). The SJC's focus on whether there was a substantial likelihood of a

miscarriage of justice was consistent with the constitutional standard, i.e., whether Silva's

due process rights were violated. See id. (quoting Cupp v. Naughten, 414 U.S. at 147, 94

S. Ct. at 400).

Here, Silva does not dispute that the SJC accurately described the evolution of the charge on mitigating factors, but argues (without legal support) that the court's conclusion that there was no substantial likelihood of a miscarriage of justice is unreasonable. This court does not agree. Rather, the SJC's thoughtful and detailed analysis is persuasive. Since the jury was given the appropriate instructions in a thorough manner, and at a time when they were clearly focused on the issue (as evidenced by their question), there was no miscarriage of justice.

## Self-Defense

The other error in the jury instructions relates to the charge on excessive force in self-defense, both in the judge's original charge and in his response to the jury's second question requesting further instruction on murder, self-defense, and voluntary manslaughter. Silva, 455 Mass. at 525, 918 N.E.2d at 86. In the midst of an accurate instruction on self-defense, the judge added the following italicized phrase:

> If the Commonwealth fails to prove beyond a reasonable doubt that the defendant did not act in self-defense, then you must find the defendant not guilty. If death resulted from the use of excessive force, *and the Commonwealth fails to prove beyond a reasonable doubt that the defendant did not act in self-defense*, but the Commonwealth does prove beyond a reasonable doubt that the defendant used excessive force in defending himself in light of all the circumstances, then you must find the defendant guilty of manslaughter (emphasis added).

Id. The SJC ruled that while the phrase could be confusing, reading the instruction as a whole, "we do not believe the jury would have been confused by the related concepts of

self defense and excessive force in self-defense." Id. at 525, 918 N.E.2d at 87.  As the

Court ruled further:

> One of the elements of self-defense is the reasonableness of the force used to defend oneself, and if the Commonwealth fails to disprove all the elements of self-defense except the element of reasonableness of the force used, i.e., that the defendant used excessive force in self-defense, then self-defense does not lie, but excessive force in self-defense will mitigate murder to voluntary manslaughter.  See *Commonwealth v. Kendrick,* 351 Mass. 203, 211, 218 N.E.2d 408 (1966).  The relationship between the concepts is sufficiently clear from the instruction.  The instruction did not create a substantial likelihood of a miscarriage of justice, but the italicized language in the quoted instruction should not be given in future cases.

Id. at 525-26, 918 N.E.2d at 87.

After the trial judge gave the disputed instruction, the jury returned again for

further instructions.  In response to their third question, the judge again provided a self-

defense instruction.  Id. at 524, 918 N.E.2d at 86.  The jury returned a verdict of

deliberately premeditated murder which, as the SJC ruled, "was supported by the weight

of the evidence, consistent with the law, and consonant with justice."  Id. at 529, 918

N.E.2d at 89.  As the SJC concluded, viewing the instructions as a whole, the jury was

appropriately instructed on the options of murder and manslaughter.  The language used in

the challenged instruction, while perhaps not a model of clarity, was not constitutionally

infirm.  There was no unreasonable application of Supreme Court law.

### 6.    Introduction of "Expert" Ballistic Evidence  (Grounds 8-11)

The remaining grounds of Silva's habeas petition relate to the fact that the

Commonwealth presented ballistics evidence at trial through the testimony of Trooper

Michael Arnold, including testimony about some tests that were conducted by Trooper Douglass Weddleton, who was unavailable for trial. This, Silva argues, violated his rights under the confrontation clause of the Sixth Amendment, as interpreted by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). (Pet. Mem. at 17). In Crawford, the Supreme Court held that the Sixth Amendment bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the declarant had had a prior opportunity for cross-examination." Id. at 53-54, 124 S. Ct. at 1365. In addition, Silva contends that both trial counsel and appellate counsel provided ineffective assistance by failing to object to this evidence. (Pet. Mem. at 17). Thus, Silva argues, his due process rights were violated by the admission of "this unfairly prejudicial evidence which rendered the trial fundamentally unfair." (Id.). Silva raised these issues in connection with his second motion for a new trial, after the issuance of the SJC decision.

The motion judge rejected Silva's claims on January 31, 2011, issuing a "Finding and Order on Defendant's Motion for New Trial and Related Motions." (Supp. RA Ex. 1). As the motion judge described the relevant facts, Arnold and Weddleton investigated the incident together and gathered the evidence together, including cartridge casings. (Id. at 2). Arnold testified based on his own part of the investigation, and based on his own knowledge and experience, regarding how the weapon operated. (Id.). In addition, during his testimony, Arnold referred to a report generated by Weddleton in which Weddleton concluded, based on his test firing of the weapon, that the fourteen discharged cartridge

casings recovered at the scene were all fired by the Glock recovered from Silva. He also concluded that "[t]he projectile evidence was insufficiently marked to make a positive identification" although "some of the evidence had rifling system that is consistent with a Glock pistol." (Id. at 2-3). During Arnold's testimony, "Arnold repeated that there were insufficient striations to positively identify any of the projectile evidence as positively being fired by the pistol in question." (Id. at 3).

Arnold also testified as to the results of a pattern test conducted by Weddleton to determine the distribution of gun shot residue at various distances. (Id. at 3). He identified the patterns that Weddleton fired in his presence using the Glock pistol, and opined that if there was no gun shot residue on the clothing of the alleged victims, the shot was from more than four feet away. (Id. at 3-4). A chemist also testified that his examination of the victims' clothing did not reveal any nitrates, and that the residue of nitrates only travel approximately three feet for most weapons. (Id. at 4). In his motion for a new trial, Silva contended that trial counsel and appellate counsel were ineffective in failing to challenge the admission of this testimony to the extent that it relied on Weddleton's work. (Id. at 4). Silva renews this argument before this court and argues that the testimony, which "purported to match petitioner's firearm to the firearm used to shoot DeAndrade and Schiano" was inadmissible under the confrontation clause of the Sixth Amendment. (Pet. Mem. at 17).

As noted above, the motion judge denied the motion for a new trial, ruling that "the court must look at the context in which the challenged evidence was offered." (Supp. RA

Ex. 1 at 4). He concluded that the failure to object to this testimony was consistent with the defendant's theory of the case, namely admitting that the defendant shot the two men, but claiming it was in self-defense. (Id. at 5). In fact, Silva had testified on his own behalf, and admitted shooting both victims multiple times with the subject weapon. (Id. at 4). As the motion judge concluded:

> In the case at bar, while hearsay testimony was provided by Arnold referencing a conclusion contained in Weddleton's report that the casings recovered were fired from the subject pistol, the opinion was clarified that the rifling system demonstrated on the casings was consistent with a Glock pistol. Furthermore, the position of the defendant at all times was that he acted in self defense in using the subject weapon. Furthermore, any decision of defense counsel not to object to the reference to Weddleton's report and ballistics testing was clearly a conscious and tactical decision in light of the defense in this case and the overwhelming evidence that Silva shot both victims. Defense counsel chose to use the ballistics evidence as to the location of the casings to support his defense that Silva was backing up while he was shooting. The court concludes that there has been no showing of ineffective assistance of trial counsel or appellate counsel in connection with the subject of ballistics evidence.

(Id. at 6). Moreover, the judge concluded "that the alleged failures of trial and appellate counsel do not rise to the level of any substantial likelihood of a miscarriage of justice." (Id. at 7).

On appeal, a Single Justice of the SJC ruled, pursuant to Mass. Gen. Laws ch. 278, § 33E, that "[t]he issues raised are not substantial." (RA Ex. C). Therefore, no further appeal was allowed. The claims of error raised by Silva do not state a basis for habeas relief.

**Procedural Default**

-47-

As an initial matter, "[a] Single Justice's finding that a petitioner has not raised a 'new-and-substantial' question for further review constitutes a finding of procedural default under state law." Costa v. Hall, 673 F.3d 16, 23 (1st Cir. 2012). Therefore, as detailed above, "federal habeas relief is barred unless the prisoner demonstrates either cause for and prejudice from the default, or actual innocence." Id. at 25 (internal citations omitted). In the instant case, Silva's direct appeal and his initial motion for a new trial were decided by the SJC on December 21, 2009, well after Crawford was issued in 2004. The SJC decision came down even after the June 25, 2009 decision in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), where the Supreme Court held that an affidavit reporting the results of a state drug analysis was a "testimonial statement" which required a witness. Id. at 309-11, 129 S. Ct. at 2531-32. Silva has not established any cause for failing to raise his confrontation clause arguments in connection with his direct appeal or in his initial motion for a new trial.

Even assuming Silva could establish "cause," he cannot establish "prejudice." This court will assume, arguendo, that Arnold improperly was allowed to testify about the tests conducted by Weddleton.[9] Nevertheless Silva cannot establish that the admission of such

---

[9] The issue whether the ballistics tests at issue were improperly admitted is dependent on whether they constitute testimonial statements. That is often a complicated issue, as evidenced by the multiple decisions by the Supreme Court Justices in Williams v. Illinois, __ U.S. __, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012), where the Court could not agree as to whether certain expert statements were testimonial. Id. at 2272-73 (five Justices "repudiate the plurality's understanding of what statements count as testimonial"). See also Hensley v. Roden, 755 F.3d 724, 733-35 (1st Cir. 2014) (courts are split on whether autopsy reports are testimonial). In the instant case, the state court assumed that it was error for Arnold to testify about the results of Weddleton's tests.

testimony "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Ortiz, 19 F.3d at 714 (describing standard for "prejudice").  In the instant case, Silva admitted to the shooting, and admitted that the gun was his.  In addition, his counsel used the results of the ballistics tests to further Silva's claim of self-defense.  Silva's objection that the challenged testimony somehow improperly "purported to match petitioner's firearm to the firearm used to shoot DeAndrade and Schiano" is without merit — the identification of the firearm was not an issue.  (See Pet. Mem. at 17).  Under such circumstances, any error was harmless beyond a reasonable doubt.  See, e.g., Commonwealth v. Ramsey, 466 Mass. 489, 497, 995 N.E.2d 1110, 1116-17 (2013) (admission of ballistics certificate without testimony was harmless beyond a reasonable doubt where defendant made the strategic decision to concede that his gun met the legal definition of a firearm); Commonwealth v. Pittman, 76 Mass. App. Ct. 905, 906-07, 923 N.E.2d 1083, 1085 (2010) (court finds error in admitting ballistics certificate without testimony to be "harmless beyond a reasonable doubt" in light of "overwhelming evidence independent of the ballistics certificate that the gun in question was operable").  Since Silva has not established cause, prejudice or actual innocence, his confrontation clause arguments are procedurally defaulted.  He has failed to state a claim which is subject to habeas review.

_____

For purposes of this habeas petition, this court will make the same assumption.

Even if this court were to go beyond the procedural default, Silva's claim must fail. With respect to his claim that his Sixth Amendment rights were violated, Silva cannot obtain habeas relief in light of the fact that any error was harmless.  See Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993) ("harmless error standard applies in determining whether habeas relief must be granted"). To obtain relief, Silva would have to establish that any error "had substantial and injurious effect or influence in determining the jury's verdict" or that he suffered actual prejudice. Id. at 637, 113 S. Ct. at 1722 (quotation and citation omitted).  Where, as here, a state court has determined that a constitutional violation is harmless, a federal court may not award habeas relief unless the harmless error review by the state court was objectively unreasonable.  Ayala v. Saba, 940 F. Supp. 2d 18, 21 (D. Mass. 2013) (state court finding that the admission of ballistics certificate without testimony was harmless was not objectively unreasonable) (citing Mitchell v. Esparza, 540 U.S. 12, 17-18, 124 S. Ct. 7, 11-12, 157 L. Ed. 2d 263 (2003)).  For the reasons detailed above, Silva has not established that the assessment by the state court was unreasonable.

### Ineffective Assistance of Counsel

Finally, Silva's challenge to the state court's finding that there was no ineffective assistance of counsel in failing to object to Arnold's testimony also must fail.  The issue before this habeas court "is whether the state court's application of the *Strickland* standard was unreasonable."  Hensley, 755 F.3d at 736 (quotation and citation omitted).  Here, the state court analyzed the context in which the challenged evidence arose, and concluded

that trial counsel made a reasonable strategic decision to use the ballisttics evidence to Silva's advantage. There was no error. "To prevail under *Strickland*, counsel's choice must have been so patently unreasonable that no competent attorney would have made it." Id. at 737 (quotation and citation omitted). Given the overwhelming evidence that Silva did the shooting, using his own gun, Silva cannot establish that trial counsel's decision not to challenge but, rather, to use the ballistics evidence in furtherance of Silva's self-defense claim, was patently unreasonable.

### 7.     **Cumulative Errors**

The parties disagree as to whether Silva has asserted a claim based on whether the cumulative effective of all the errors at trial resulted in a trial that violated his due process rights. That issue does not need to be resolved because, as detailed herein, Silva's claims of unfairness do not warrant habeas relief.

As discussed above, even where individual errors may not require reversal, a combination of errors may "disfigure the proceedings so significantly as to undermine our confidence that the defendant received a fair trial." Gonzalez-Melendez, 594 F.3d at 37 (citation omitted). The court is to look at the case in its entirety, including, without limitation, "the nature and number of the errors, their interrelationship, if any, how the [trial] court dealt with the errors as they arose, the length of the trial, and the strength of the government's case." Id. Here, none of the alleged errors were significant, nor were they egregious. It was undisputed that Silva shot two men and killed one of them, and that the victims were unarmed. Defense counsel cross-examined the government's witnesses,

put on evidence on Silva's behalf, and marshaled the evidence to support Silva's claim of self defense.  The jury was instructed on numerous occasions about self-defense, but apparently concluded that the Commonwealth had proved beyond a reasonable doubt that Silva did not act in self-defense.  The SJC found that "[t]he verdict of deliberately premeditated murder was supported by the weight of the evidence, consistent with the law, and consonant with justice."  <u>Silva</u>, 455 Mass. at 529, 918 N.E.2d at 89.  This conclusion is not objectively unreasonable, and this court finds no basis to disturb the state courts' rulings.  Silva's habeas petition must be denied.

## IV.  CONCLUSION

This court has reviewed all of Silva's objections individually and collectively.  He has failed to establish any errors warranting habeas relief.  The petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

  / s / Judith Gail Dein              
Judith Gail Dein
U.S. Magistrate Judge
